**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LONZA GREENWOOD LLC, | |
| Plaintiff, | Case No.: |
| v. | |
| NATALS, INC. d/b/a RITUAL, | |
| Defendant. | |

## COMPLAINT

Plaintiff Lonza Greenwood LLC ("Lonza") files this Complaint against Defendant Natals, Inc. d/b/a/ Ritual ("Ritual") (collectively referred to as the "Parties"), and alleges as follows:

## INTRODUCTION

1.      Lonza brings this action to address multiple breaches by Ritual of the Parties' Sales Agreement effective as of January 1, 2024, which was predicated upon the Parties' mutual exclusivity obligations (the "Exclusive Sales Agreement"). Ritual's contract breaches include violations of the exclusivity and confidentiality provisions of the Exclusive Sales Agreement; failure to make timely payments for (1) Lonza's Products (as defined below), (2) interest payments for late charges, and (3) credit card fees; and making payments by credit card multiple times without providing Lonza with the notice required under the Exclusive Sales Agreement. Finally, Ritual also breached the Exclusive Sales Agreement by sharing Lonza's trade secret information to a third-party ("Competitor").  Ritual's disclosure of Lonza's trade secret information enables Competitor to assume a manufacturing role for Ritual by leveraging proprietary Lonza information, thereby undermining Lonza's legal and contractual rights and

1

facilitating Ritual's efforts to exclude Lonza from the Exclusive Sales Agreement that both Parties negotiated and relied upon.

## PARTIES

2.      Lonza is a limited liability company organized under the laws of Delaware with its principal place of business in Greenwood, South Carolina.

3.      Ritual is a corporation organized under the laws of Delaware with its principal place of business in Culver City, California.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

6.      This Court also has supplemental jurisdiction over Lonza's state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) and under the Exclusive Sales Agreement, which provides for exclusive jurisdiction in the federal and state courts located in New York, New York.

## FACTUAL ALLEGATIONS

**General Background:**

8.      Lonza is a global leader in capsules and health ingredients ("CHI"), offering specialized capsule technologies for pharmaceutical and nutraceutical applications as well as ingredients for the nutraceutical market.

9.      Through its global manufacturing and logistics network, Lonza serves nearly 2,000 customers worldwide, supporting the health of millions of patients and consumers.

10.      To maintain its industry leadership, Lonza has invested substantial financial and human capital in developing proprietary CHI manufacturing processes, quality control systems, equipment, and techniques.

11.      These investments have enabled Lonza to build long-term relationships with Lonza's vendors and customers.

12.      Ritual is a health and wellness company that procures and sells vitamins and dietary supplements. Ritual represents that its business model emphasizes transparency through its "Made Traceable®" philosophy, which discloses ingredient sourcing and supply chain information. The Products (defined below) are packaged in transparent capsules to showcase their contents.

**Lonza and Ritual's Business Relationship:**

13.      Manufacturing the Products at issue, defined below in paragraph 18, requires specialized processes, technical know-how, and quality control systems, which Lonza possesses and has developed through substantial investment and experience in the CHI manufacturing industry.

14.     Prior to entering into the Exclusive Sales Agreement, Lonza and Ritual maintained a commercial relationship governed by individual purchase orders. Under this arrangement, Ritual submitted orders for specific quantities of product, which Lonza manufactured and delivered, followed by invoicing in accordance with Lonza's standard Terms and Conditions of Sale.

15.     Based on the success of their prior dealings, the Parties negotiated and entered into the Exclusive Sales Agreement to formalize their relationship and provide mutual commercial benefits. The Exclusive Sales Agreement afforded Lonza protections through certain forecasting and binding purchase order lead-time requirements. Ritual received numerous benefits, including but not limited to substantially discounted pricing, price adjustment protection, rebates based on achieving certain sales volumes, and capacity and safety stock commitments.

16.     The Exclusive Sales Agreement also includes a mutual exclusivity clause restricting Ritual from sourcing or Lonza from manufacturing the covered Products through or for third parties.

17.     The Exclusive Sales Agreement established an initial term from January 1, 2024, through December 31, 2028, with automatic one-year renewal periods thereafter unless either Party provided written notice of non-renewal at least nine months prior to the expiration of the then-current term.

18.     Under the Exclusive Sales Agreement, Lonza agreed to provide capsules and manufacture the following Ritual finished product lines (the "Products"):

    a.   Essential for Women Prenatal Multivitamin

    b.   Essential for Women Postnatal Multivitamin

    c.   Essential for Women 18+ Multivitamin

    d.   Essential for Women 50+ Multivitamin

e.  Essential for Men 18+ Multivitamin

f.  Essential for Men 50+ Multivitamin

g.  Essential for Teens for Him Multivitamin

h.  Essential for Teens for Her Multivitamin

i.  Synbiotic+

j.  HyaCera Skin Capsule

k.  Omega-3

l.  Natal Choline

19.    Section 7 of the Exclusive Sales Agreement, excerpted below, sets forth the Parties'

binding exclusivity obligations, which prohibit Ritual from sourcing or manufacturing the covered

Products through third parties:

> 7. **Exclusivity.**
>
> (a) Exclusivity Scope.  Seller agrees to exclusively supply to Buyer, and Buyer agrees to exclusively purchase from Seller Products ("Exclusivity Obligations") that meet all of the following parameters:
>
> > i. Products must be in the format of a capsule in a capsule filled with oil or beadlets in a capsule filled with oil; and
> >
> > ii.    The formulation of the Products must contain five (5) or more of the following ingredients: (a) Folate/Folic Acid; (b) Iron; (c) Vitamin B12; (d) Magnesium; (e) Choline; (f) Vitamin A; (g) Vitamin K1/K2; (h) Vitamin D; (i) Omega 3; and (j) Biotin ("Exclusive Products").
>
> (b) Other Exclusivity Terms.  Such Exclusivity Obligations are; (i) geographically limited to the U.S.A. and Canada; (ii) exclude multilevel marketing organizations ("MLMs"); (iii) only applies to new business not existing business for Sellers as of August 25, 2023 (Seller to provide any non-confidential report to support that such business existed prior to August 25, 2023 to the extent permitted by applicable law by January 31, 2024); and (iv) be subject to Buyer meeting the Minimum Exclusivity Volume (defined below).  Exclusivity may be extended beyond the original Term by mutual signed agreement.

(c) <u>Minimum Volume Requirement</u>.  To maintain mutual Exclusivity Obligations, Buyer must purchase a minimum cumulative volume of Exclusive Products in the amount of 260 million units in calendar year 2024 (Minimum Volume Requirements").  Each calendar year following 2024, the Minimum Volume Requirement increases annually by 5% during the Term.

(d) <u>Mutual Exclusivity</u>.  Exclusivity Obligations exist along terms of mutual exclusivity.  In the event either party materially breaches the Exclusivity Obligations set forth in this Agreement, in addition to any other rights and remedies available to the other party, such other party shall have the right, but not obligation, to terminate its own Exclusivity Obligations hereunder upon written notice to the breaching party, and the breaching party's exclusivity rights will be terminated and, as the sole and exclusive remedy for the non-breaching party, and the sole and exclusive liability of the breaching party, such breaching party will pay the nonbreaching party an amount of liquidated damages equal to twenty percent (20%) of the annual value of this Agreement for the calendar year in which the Exclusivity Obligation breach was committed ("Annual Value").  The Annual Value will be calculated as the aggregate total of the immediately prior eight (8) months of Product invoices plus four months of BPOs for the upcoming four month period.  The breaching party will pay such Annual Value to the non-breaching within 180 days of the date of receipt invoice.  Additionally, should either party exercise its right to terminate its Exclusivity Obligations under any other provision of this Agreement outside of this Section 7, the other party has the right to terminate its Exclusivity Obligations immediately upon written notice, with no liability to either party.  Further, the Capacity Requirements under Section 2(b) and Section 6 will also terminate upon either party's termination of its Exclusivity Obligations.

20.     In reliance on the Exclusive Sales Agreement—particularly its exclusivity clause—Lonza made significant investments to support its relationship with Ritual. These include, but were not limited to: (i) declining other potential customers; (ii) reserving production capacity to meet Ritual's fulfillment needs; (iii) establishing a dedicated value chain management team to oversee operations and participate in monthly governance meetings with Ritual; (iv) establishing a second manufacturing site for the Products; (v) a project implementation timeline and business continuity plan timeline; and (vi) forming a dedicated team responsible for developing a comprehensive business case and timeline for Product bottling and packaging.

21.     Additionally, in reliance on the Exclusive Sales Agreement, Lonza, in good faith, continues to  invest as much as approximately $10 million at any time in raw materials to support

Ritual's fulfillment needs based on Ritual's initial and final annual forecasts for total production units.

22.     Pursuant to the Exclusive Sales Agreement, Lonza agreed to source raw material from Ritual's mandated supplier, Competitor, who had production delay problems.  This meant that, to meet Ritual's requirements, Lonza had to pay to purchase raw materials in anticipation of Ritual's needs so that these raw materials would be ready when Ritual placed a purchase order under the Exclusive Sales Agreement for more Products.  Interestingly, up until May 2025, if Ritual decided that it did not need as much Product as it forecasted, Lonza was able to work collaboratively to find a business solution with Competitor.  But suddenly, as of May 2025, Competitor has refused to engage in collaborative discussions, leaving Lonza with millions of dollars' worth of unused raw materials and an exclusivity obligation that precludes Lonza from using them.  Ritual also requires that raw materials for its Products comply with its own artificially imposed shelf life, even though the raw materials can be months away from expiration.

**Qualification of Products and Establishment of a Second Manufacturing Site**:

23.     As part of the Agreement and consistent with the Parties' established course of dealing, Lonza committed to providing Ritual with reports for each Product line.

24.     The report format, including the required content, was provided by Ritual, and the Reports contain detailed, proprietary information and analyses of each product's specifications and confirm compliance with all applicable federal, state, and international regulations governing the manufacture, filling, packaging, testing, storage, and release of food products for consumer use.

25.     In accordance with the Parties' customary business practices—both prior to and following the effective date of the Exclusive Sales Agreement—Lonza did not provide Ritual with

physical product samples. Instead, Ritual reviewed and approved the reports as the basis for Product qualification.

26.     Pursuant to the Exclusive Sales Agreement, and in order to ensure it could meet Ritual's production and fulfillment timelines, Lonza committed to having its Colmar, France manufacturing site qualified to manufacture the Products and set up manufacturing lines dedicated to the production of the Products.

27.     To maintain transparency regarding the onboarding of the Colmar facility, and with the confidentiality provisions of the Exclusive Sales Agreement in place, Lonza provided Ritual with monthly updates on the implementation timeline and business continuity planning during regularly scheduled governance meetings and weekly production meetings.

**Supply Chain Shortages from the Competitor**.

28.     On July 17, 2024, during a governance meeting and in follow-up written communications, Lonza informed Ritual of challenges in qualifying certain Products for production in Colmar.  These challenges stemmed from a shortage of raw materials supplied by the Competitor, a vendor designated by Ritual.

29.     In response, Lonza proposed prioritizing the qualification of certain Product lines over others and also prioritizing production batches.  Ritual agreed.

30.     To memorialize the Parties' agreement to defer qualification of certain Product lines due to the supply chain delays, Lonza provided Ritual with a proposed amendment to the Agreement on December 30, 2024, adjusting the relevant qualification timelines. Ritual did not respond but continued to validate this approach on the monthly governance call and accepted Lonza's shift in production in accordance with this agreement.

31.     On March 3, 2025, Lonza again contacted Ritual to execute the proposed amendment. Ritual again failed to respond.

**Ritual Purports to Terminate the Exclusivity Obligation of the Agreement.**

32.     On March 18, 2025, Ritual, through counsel, sent a letter purporting to terminate the Exclusivity Obligations under the Exclusive Sales Agreement, alleging that Lonza failed to meet its obligations under Section 6(b) of the Exclusive Sales Agreement.

33.     Ritual's termination letter omits any reference to the Parties' July 2024 agreement and mutual understanding regarding the supply chain delays caused by Ritual's designated supplier, the Competitor.

34.     Ritual has alleged that Lonza's failure to provide physical product samples constitutes a breach of the Exclusivity Obligations of the Exclusive Sales Agreement and purportedly justifies its unilateral termination of the Exclusivity Obligations.

35.     Lonza did not agree with Ritual's attempted termination of the Exclusivity Obligations and began immediate discussions with Ritual to attempt to resolve the dispute.

36.     Throughout the entirety of the Parties' business relationship, Lonza has never provided Ritual with physical product samples related to the qualification without a signed protocol. Instead, the Parties consistently relied on the reports in the process dictated by Ritual, for product approval, in accordance with their established course of dealing.

37.     On or about March 18, 2025, Ritual communicated its incorrect understanding that Lonza had breached the mutual exclusivity provision by failing to qualify another site despite the Parties' mutually agreed upon timelines and obligations that shifted priority away from that provision.  According to Ritual, this would have released them from their Exclusivity Obligations and any associated penalties.

**Ritual's Failure to Pay Invoices and Related Fees.**

38.    During the first year of the initial term of the Exclusive Sales Agreement, Ritual failed to remit payment for multiple invoices issued by Lonza.

39.    Additionally, Ritual's preferred payment method is by credit card. The Parties agreed in the Exclusive Sales Agreement that any payments made via credit card would require five (5) business days' notice by Ritual to Lonza prior to invoicing and include reimbursement for associated processing fees. Despite this explicit term in the Exclusive Sales Agreement, and repeated reminders from Lonza of Ritual's obligation to provide notice, and at the very least, remit timely payment of the fees set forth in the Exclusive Sales Agreement, Ritual's repeated failure to provide the proper notice required under the Exclusive Sales Agreement, and repeated failure to timely pay the processing fees, effectively shifted this financial burden to Lonza and violated the Exclusive Sales Agreement.

40.    Furthermore, the Exclusive Sales Agreement sets forth interest payments that Ritual is required to pay on all late payments, which Ritual also failed to timely pay, despite repeated reminders.

41.    By not paying in a timely manner, Ritual leveraged Lonza as a *de facto* interest-free credit institution that both provides interest-free loans for Products supplied and covers credit card fees as Ritual receives timely shipments of Products while delaying payment obligations.

**Lonza's Trade Secrets and Ritual's Breach of Confidentiality.**

42.    At all relevant times, Lonza employed a comprehensive, multi-layered strategy to protect its confidential and proprietary information, including trade secrets related to the manufacture of the Products. These safeguards included requiring employees to sign strict

confidentiality and non-disclosure agreements, restricting access to sensitive technologies and processes, and operating secure manufacturing facilities for all product lines.

43.    Lonza employs multiple technical measures to protect its confidential and trade secret information from unauthorized disclosure. These measures include: (i) restricting physical and electronic access to sensitive documents; (ii) distributing key technical documents across separate systems; (iii) limiting access to confidential information to employees and customers on a need-to-know basis; and (iv) implementing a data loss prevention program that alerts Lonza when restricted information is accessed or copied.

44.    Pursuant to the Exclusive Sales Agreement, the Parties' are required to:

> Confidentiality and Data Protection. Each party acknowledges that the other party information relating to Products, specifications, services, equipment, materials, and capsule filling that either Party ("Disclosing Party") shares with the other Party ("Receiving Party') is confidential and proprietary to the Disclosing Party, and the Receiving Party agrees to maintain the confidentiality of any such information disclosed by the Disclosing Party during the Term of this Agreement, and for a period of ten (10) years thereafter and to use such information only for the purpose of filling LONZA CHI capsules (with respect to Buyer) or manufacturing the Products (with respect to Seller), unless such information constitutes trade secrets, in which case Receiving Party must maintain the confidentiality of such information so long as it remains a trade secret under applicable laws. Receiving Party will safeguard and protect the Disclosing Party's confidential and proprietary information in the same manner it protects its own similar information, and in no event utilizing less than reasonable industry practices.

> Exclusive Sales Agreement, Exh. D, §8 ("Confidentiality Obligations").

45.    Throughout the course of their business relationship, Lonza provided Ritual with detailed and specific confidential and trade secret information related to its development processes and technologies—such as methods for combining ingredients for proper capsule dosing, custom modifications to stock filling machinery to ensure dosing accuracy, systems for precision dosing,

pellet-based beadlet insertion techniques, temperature control processes for holding tanks, and proprietary capsule capping technology.

46.    Under the Confidentiality Obligations in the Exclusive Supply Agreement, Lonza effectively provided Ritual with blueprints of the manufacturing processes for the Products covered under the Exclusive Sales Agreement.

47.    Critically, during a March 6, 2025, governance meeting between Lonza and Ritual, subject to the Confidentiality Obligations of the Exclusive Sales Agreement, Lonza shared confidential, proprietary, and trade secret information with Ritual verbally and via a business presentation. This meeting detailed some of Lonza's key performance indicators related to supplier performance, delivery, and yield, manufacturing protocols, including mixing, heating, cooling, and pressing methods developed exclusively by Lonza. These protocols contain Lonza proprietary data and trade secrets.

48.    Within two hours of that March 6, 2025 governance meeting, a representative from Competitor contacted Lonza and asked detailed questions about the proprietary information contained in the presentation that Lonza had just shared with Ritual.

49.    Upon information and belief, a Ritual representative shared Lonza's trade secret information reflected in that analytics dashboard with the Competitor. This was not authorized by Lonza.

50.    Upon information and belief, Ritual disclosed Lonza's confidential and trade secret information in a covert effort to position Lonza's supplier (the Competitor) as a direct competitor to Lonza, using Lonza's own trade secrets to do so.

51.    Upon information and belief, Lonza believes that Ritual intends to complete this switch from Lonza to the Supplier in the second quarter of 2026.

**Ritual's June 2025 Request for Proposal**

52.    Adding insult to injury, on June 17, 2025, Ritual sent Lonza a request for proposal ("RFP") for a capsule that, as described in the RFP, would be made via the same technology as the Lonza-exclusive Products—yet claimed another bidder was in consideration.

53.    Upon information and belief, there is not another supplier, including Competitor, that has the specialized manufacturing technology and processes required to produce the product as specified in Ritual's RFP.

54.    While preparing its response to Ritual's RFP, on July 9, 2025, Lonza contacted one of no more than a handful of potential suppliers for the new product's necessary ingredient as the new product was defined in the RFP. The new product, as specified, required a specialized and unique ingredient. During the call to the supplier of the specialized and unique ingredient, the supplier expressed surprise that Lonza was requesting a quote for this specific ingredient, noting that it had just been contacted by Competitor seeking a quote for the exact same item.

55.    The timing of Lonza's and the Competitor's outreach to the ingredient supplier strongly suggests that if Competitor is in a position to bid on the RFP, it is because Ritual shared Lonza's trade secrets with Competitor to enable them to manufacture the capsule.

56.    Ritual did not grant Lonza the contract for the RFP product, nor would Ritual state who won the contract.

57.    Lonza and Ritual entered into a long-term, exclusive manufacturing relationship built on mutual trust, substantial investment, and clearly defined contractual obligations. Lonza upheld its end of the bargain by dedicating resources, infrastructure, and proprietary technology to support Ritual's Product lines. In contrast, Ritual exploited the relationship by failing to timely

pay for delivered goods, failing to timely pay required fees and interest, failing to provide required notice of intent to pay by credit card, misappropriating Lonza's trade secrets, and unlawfully terminating the Exclusivity Obligation to benefit itself and a competitor. These actions have caused and is causing significant financial and non-financial harm to Lonza and undermines the integrity of the Parties' Agreement.

### FIRST CLAIM FOR RELIEF

(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

58.     Lonza incorporates all factual allegations within this Complaint.

59.     Lonza owns and possesses valuable trade secrets as defined 18 U.S.C. § 1839(3), including but not limited to proprietary systems, methods, and processes for manufacturing pharmaceuticals and nutraceutical capsules.

60.     These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

61.     During all relevant times, Lonza adhered to a comprehensive approach to safeguard its confidential and proprietary information and trade secrets.

62.     During the course of their contractual engagement, Ritual was granted privileged access to Lonza's trade secrets solely for information purposes related to the manufacturing and production of the exclusive Products it contracted Lonza to produce. Ritual was contractually and legally obligated to refrain from disclosing or using this information for any unauthorized purpose.

63.     Despite these obligations, Ritual knowingly and willfully misappropriated Lonza's trade secrets and provided them to Ritual's Supplier in an effort to assist Ritual's Supplier in developing the same manufacturing and processing technology such that Ritual's Supplier would be able to supply Ritual with its Products instead of Lonza.

14

64.     Ritual's disclosure of Lonza's proprietary manufacturing protocols to Ritual's Supplier enabled Ritual's Supplier to replicate Lonza's specialized processes, including its proprietary mixing, heating, cooling, and pressing methods. These methods were developed through years of investment and innovation and are not publicly available or easily reverse-engineered.

65.     By providing Ritual's Supplier with this confidential information, Ritual facilitated the Competitor's ability to manufacture the same Products that Lonza was contractually entitled to produce exclusively. This not only deprived Lonza of its contractual rights but also allowed Ritual's Supplier to unfairly compete using Lonza's proprietary technology, causing Lonza to lose its competitive advantage and suffer irreparable harm.

66.     Ritual's misappropriation of Lonza's trade secrets was willful and malicious entitling Lonza to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3)(C) & (D).

67.     As a direct and proximate result of Ritual's misconduct, Lonza has suffered and continues to suffer actual damages, irreparable harm, and loss of competitive advantage in an amount to be proven at trial.

68.     Lonza is also entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A) to prevent any further use or disclosure of its trade secrets by Ritual.

### **SECOND CLAIM FOR RELIEF**

(Breach of Contract - Nonpayment)

69.     Lonza incorporates all factual allegations within this Complaint.

70.     At all relevant times, Lonza and Ritual were parties to a valid, written, and Exclusive Sales Agreement under which Lonza agreed to manufacture and sell, and Ritual agreed to purchase, specified Products under the terms set forth in the Exclusive Sales Agreement.

71.     Lonza delivered Products ordered by Ritual and issued invoices in accordance with the exclusive pricing and payment provisions contained in the Exclusive Sales Agreement.

72.     Under Section 4 of the Exclusive Sales Agreement, Ritual is obligated to pay for all Products ordered and delivered pursuant to its Binding Purchase Orders.

73.     Lonza fully performed its obligations by timely manufacturing and delivering Products specified in Ritual's Binding Purchase Orders.

74.     Ritual breached the Exclusive Sales Agreement by failing to remit in a timely manner (1) payment for certain Products delivered by Lonza, (2) interest payments for late charges, and (3) credit card fees.

75.     Ritual's late payments constitute a material breach of its obligations under Section 4 of the Exclusive Sales Agreement.

76.     As a direct and proximate result of Ritual's breach, Lonza has suffered and continues to suffer financial damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

(Breach of Contract – Exclusivity)

77.     Lonza incorporates all factual allegations within this Complaint.

78.     At all relevant times, Lonza and Ritual were parties to a valid, written, and Exclusive Sales Agreement under which Lonza agreed to manufacture and sell, and Ritual agreed to purchase, specified Products under the terms set forth in the Exclusive Sales Agreement.

79.     Ritual has attempted to unilaterally terminate the Exclusivity Obligations of the Exclusive Sales Agreement communicating its intent, without rightful justification or consent, to engage Competitor to manufacture the exclusive Products Lonza contracted to produce for Ritual.

80.     Lonza has performed all of its obligations under the Exclusive Sales Agreement.

16

81.     As a direct and proximate result of Ritual's breach of the mutual exclusivity provision and under Section 7(d) of the Exclusive Sales Agreement, Lonza is entitled to liquidated damages equal to twenty percent of the annual value of the Exclusive Sales Agreement for the calendar year in which the exclusivity obligation breach was committed.

## FOURTH CLAIM FOR RELIEF

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

82.     Lonza incorporates all factual allegation within this Complaint.

83.     At all relevant times, Lonza and Ritual were Parties to a valid, written, and Exclusive Sales Agreement.

84.     Every contract under New York law includes an implied covenant of good faith and fair dealing, which requires that neither party do anything to deprive the other of the benefits of the agreement.

85.     Lonza performed its obligations under the Exclusive Sales Agreement in good faith, including investing substantial resources, reserving production capacity, and sharing proprietary information to support Ritual's Product lines.

86.     Ritual breached the implied covenant by, among other things, (i) failing to timely pay (1) for Products delivered by Lonza, (2) interest payments for late charges, and (3) credit card fees; and; (ii) misappropriating Lonza's confidential and trade secret information; (iii) unilaterally terminating the exclusivity provision without justification; and (iv) engaging a competitor to manufacture the same Products covered by the Exclusive Sales Agreement.

87.     Ritual's conduct was arbitrary, unreasonable, and intended to deprive Lonza of the benefit of the Exclusive Sales Agreement.

88.     As a direct and proximate result of Ritual's breach of the implied covenant, Lonza has suffered damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment – Plead in the Alternative)

89.     Lonza incorporates all factual allegations within this Complaint.

90.     To the extent the Exclusive Sales Agreement is found unenforceable or inapplicable to any of the conduct alleged herein, Lonza pleads unjust enrichment in the alternative.

91.     Lonza conferred substantial benefits upon Ritual, including the delivery of Products, the provision of proprietary manufacturing processes, and the reservation of production capacity.

92.     Ritual knowingly accepted and retained these benefits without providing full compensation or honoring its obligations.

93.     Under principles of equity, Ritual should not be permitted to retain the benefits conferred by Lonza without paying for them.

94.     As a result of Ritual's unjust enrichment, Lonza has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

For these reasons, Lonza seeks the following relief against Defendant:

1.     Equitable relief in the form of a preliminary and permanent injunction against Defendant Ritual from disclosing Lonza's confidential, proprietary, and trade secret information to any person or entity.

2.     Damages in excess of $75,000.00.

3.     Liquidated damages in an amount to be proven at trial for breach for the exclusivity provision of the Exclusive Sales Agreement.

4.     Punitive damages.

5.      Reasonable attorneys' fees and costs of this action.

6.      Prejudgment and post-judgment interest as allowed by law.

7.      Such other and further relief as the Court deems just and proper.

Dated: July 31, 2025                                  Respectfully submitted,

                                                     By:_____
                                                     Anne Elise Herold Li
                                                     Paul B. Keller
                                                     BROWNSTEIN HYATT FARBER
                                                     SCHRECK, LLP
                                                     600 Massachusetts Ave. NW, Ste. 400
                                                     Washington, DC 20001
                                                     Telephone: (202) 296-7353
                                                     Email:  ali@bhfs.com
                                                                     pkeller@bhfs.com